## W. IRVING LINCOLN *vs.* ESTELLA WILLARD.

Suffolk.    January 4, 1937. — February 24, 1937.

Present: RUGG, C.J., PIERCE, DONAHUE, LUMMUS, & QUA, JJ.

*Devise and Legacy,* What estate, Power. *Power. Words,* "Need."

A devise to the testator's sister of "all of my right and title in our home," which was owned by the testator and his sister as tenants in common, "for her own, with the right to sell or dispose of the same if she should need to during her life time," with a later provision that after "the death of my sister . . . I desire that the home place be given to" another, "as she will direct in her will, and as I hereby direct," was construed, in the circumstances attending the making of the will, to create only a life estate in the sister with a power to sell in the contingency of her need, and a vested remainder in the other person named subject to being divested by a proper exercise of such power.

In the circumstances attending the devise of a life estate to an elderly sister of the testator "with the right to sell or dispose of the same if

she should need to during her life time," the word "need" was construed to mean financial or physical necessity, and a conveyance by the sister in consideration of the grantee's furnishing her a home, companionship and care, but where no such need had arisen, was not a valid execution of power given her.

WRIT OF ENTRY in the Land Court, dated November 7, 1935.

The action was heard by *Davis*, J., who ordered judgment for the demandant. The tenant alleged exceptions, which, after the death of *Davis*, J., were allowed by *Corbett*, J.

*R. L. Lurie*, for the tenant.

*A. F. Richard*, for the demandant.

PIERCE, J. This is a writ of entry to recover possession of a parcel of land on Gannett Street in Scituate, known as the Ellms "home place." At the time of the death of Benjamin T. Ellms, who died in Scituate in 1922 at the age of ninety-one, he was the owner in fee simple of an undivided three-fifths interest in the Ellms "home place," and his sister, Harriet R. Ellms, owned the remaining two fifths. The issues in this case arise out of the construction of the will of Benjamin T. Ellms, and more particularly out of the construction of the following paragraphs: (1) "To my sister, Harriet R. Ellms, I leave and bequeath all of my right and title in our home on Gannett Street in both land and buildings for her own, with the right to sell or dispose of the same if she should need to during her life time, also my wood lot in Norwell with the same privilege." (2) "To my sister Harriet, I also give all money of which I am possessed, for her own use during her lifetime, to use as she may find necessary." (3) "After the death of my sister Harriet R. Ellms, I desire that the home place be given to W. Irving Lincoln as she will direct in her will, and as I hereby direct." (4) "To W. Irving Lincoln I leave the sum of one thousand dollars from my estate remaining in my sister's possession at time of her death." The will then provided for other pecuniary legacies, aggregating about $10,000, from funds remaining from his estate after Harriet's death, and Harriet by her final will provided fully for their payment.

The sole issue presented by the bill of exceptions is whether the judge was correct in granting the following rulings: "5. That under the terms of Benjamin T. Ellms' will, Harriet R. Ellms took a life estate in 'the home place' on Gannett Street with a power to sell or dispose of it if she should need to during her lifetime and W. Irving Lincoln took a vested remainder in 'the home place' subject to being divested by a proper exercise of Harriet's power"; and "6. That on the evidence in this case there was not a valid execution by Harriet R. Ellms of the power to sell or dispose of 'the home place.'" The demandant was named as executor and served as such.

The decision of the Land Court contains a statement of the following facts: In 1878 Benjamin T. Ellms, Harriet R. Ellms and their two sisters bought from one Litchfield the lot of land on Gannett Street in Scituate on which their house was built. They also bought shortly afterwards another small lot on Gannett Street at the northwest corner of the Litchfield lot. When Benjamin died, title to three fifths of the above land was vested in him and two fifths was vested in his sister Harriet. After 1878 Benjamin individually bought adjoining lots, referred to as the Studley, Lane and Town lots. In 1900 Benjamin conveyed to the demandant part of the Lane lot and from time to time thereafter Benjamin or Benjamin and Harriet conveyed portions of the Gannett Street land to the demandant or to his wife. The land on which the Ellms house stood with the remaining land surrounding it was known as the "home place." Benjamin T. Ellms had been a ship-wright and a farmer. He carried on the "home place" as a farmer with the help of the demandant, who had lived on the opposite side of Gannett Street until 1903, when he built his home on the land he had purchased from the Ellmses. Benjamin's sister Harriet, who was nine years younger than he, lived with him on the "home place." They lived very frugally, had no servants and did the housework between them. The demandant and his wife were on very intimate terms with Benjamin and Harriet Ellms. The Ellmses and the Lincolns were neighbors and friends for

years. They visited back and forth, and Mr. or Mrs. Lincoln saw Benjamin and Harriet in the Ellms home practically every day for twenty years. The Ellmses were elderly people when the Lincolns built their house on Gannett Street. Theirs was a country neighborhood. When, as happened more frequently with their advancing years, accident or sickness befell the Ellmses, the Lincolns came to their assistance and, the Ellmses being without servants, Mrs. Lincoln nursed and cared for them. When Benjamin was ninety-one years of age, he was stricken with his last illness, which lasted about a month. Harriet was also sick in bed at the time. As usual Mrs. Lincoln nursed both of them. She prepared their food at her own home and brought it over to them. During Benjamin's last illness he decided to make a will, and sent a message by Mrs. Lincoln to Harriet, who was then ill in another room, stating that he was going to make a will and that he would leave Harriet all his money to do as she pleased with if she would let him give away the "home place" to the demandant. She sent back word that she did not want either of them to make a will, as no one in their family ever had. Two days later, on March 24, 1922, Harriet sent word to Benjamin that she was going to make a will and would do as he wanted her to and that he could make a will if he wished to. Harriet then directed Mrs. Lincoln to send for one Richardson, the local druggist, who was also a notary public and town treasurer and who often drew wills. He came and, after consultation with both Benjamin and Harriet, prepared the will in question and another for Harriet, and both were executed. At the time of the execution of the two wills in 1922 both Benjamin and Harriet were alert mentally, and knew what they wanted. After Benjamin's death Harriet continued to live alone on the demanded premises until 1924. She was then very sick for four months, during which time she tried to get someone to come and live with her. She was eighty-four years of age. A neighbor came in and "did for her" during the daytime, but could not stay nights. Mrs. Lincoln came in and stayed nights but had to leave early in the morning,

leaving Harriet alone in the house. She was afraid of being left alone on account of fire. The tenant had known the Ellmses all her life, and before her marriage had visited them. Her mother was living in Scituate and was an old friend of Harriet. She herself was married and living in Canton. Her husband had been a superintendent of schools, but had retired. In June, 1924, Harriet sent for the tenant and told her that if she and her husband would come and live with and take care of her she would give the tenant a deed of the home place. This was agreed, and by deed dated July 3, 1924, Harriet conveyed to the tenant and her husband as tenants by the entirety (her husband has since deceased) the home place together with the wood lot in Norwell. This deed contained the following clause: "The condition of this conveyance being that the grantee herein named shall as agreed give me a home in the home dwelling with all the comforts and care necessary for my maintenance, health, and happiness during the remaining years of my life. And it is further agreed that all expenses for medical attention for my own personal needs shall be met by the grantor." No pecuniary consideration passed. The tenant and her husband moved to the demanded premises and lived there for three years with Harriet. During this period Harriet continued to live as frugally as before. Then Harriet left them and brought a writ of entry against them to recover the demanded premises. In the meantime Harriet had made another will. Before her writ of entry could be tried she died, and later the residuary devisees under her new will and the administrator *cum testamento annexo* released to the tenant and her husband all right, title and interest of Harriet in and to the demanded premises arising from any breach of condition in said deed or otherwise, with a general mutual release of all claims and causes of action. The personal estate of Benjamin was inventoried at about $28,000, and Harriet received therefrom about $31,000. The inventory value of Harriet's estate was a little over $58,000, consisting of a special savings bank account of $10,110 "for distribution per terms of will of Benjamin T.

Ellms," $2,200 in government securities, and the rest in cash in various banks.

On the above facts the demandant contends that Benjamin gave to Harriet a life estate in the Gannett Street property with a limited power of disposal during her lifetime, which she did not exercise within the terms of the power. On the same facts the tenant contends that the devise to Harriet was of an estate in fee simple, and, if it was not an estate in fee, it was an estate for life with a power of disposal which was duly exercised. It is the further contention of the tenant that the bequest to Harriet R. Ellms of "all of my right and title" "for her own," with the right to sell and dispose of the same if she should need to during her lifetime, created an absolute ownership, because under a life estate she could not have taken all the testator's "right and title" and because under G. L. (Ter. Ed.) c. 191, § 18, "A devise shall convey all the estate which the testator could lawfully devise in the land mentioned, unless it clearly appears by the will that he intended to convey a less estate"; she also contends that it is manifest that the primary intent of the testator was to provide for his sister, who was aged and alone, and that the words "with the right to sell or dispose of the same if she should need to during her life time" were of no effect because, by a previous gift of all his "right and title" to Harriet "for her own," he had divested himself of all his right and title and he could not again give her permission to do something with property which he did not have any right or title to, and that, consequently, these quoted words were inconsistent, repugnant and void and tended to defeat the already vested interest.

The answer to this position is that the words "all of my right and title . . . for her own," when read in connection with the remaining words of the paragraph in which these words appear, do not clearly show a general intent that the devisee should take the estate in fee simple, and do show a purpose to create a life estate with a power to sell or dispose of the same if the life tenant should need to during her lifetime. The intention of the testator ap-

pears to be that the devisee should take a life estate with power to sell the estate in the contingency of her need, in view of the provision of the subsequent clause of the will providing that "After the death of my sister Harriet R. Ellms, I desire that the home place be given to W. Irving Lincoln as she will direct in her will, and as I hereby direct." This manifestly was all that the testator could do in regard to Harriet's two-fifths interest, and marked his intent as to the disposition of his own three-fifths interest. Had the devise been in fee the words "as I hereby direct" would have been absolutely meaningless and void, and so as to the power of sale and disposal in regard to the "home place." See in this connection *Kent* v. *Morrison,* 153 Mass. 137; *Bramley* v. *White,* 281 Mass. 343; *Hill* v. *Taylor, ante,* 107.

It remains to consider whether upon the facts found the power of disposal of the testator's interest in the "home place" by the life tenant was exercised within the terms of the power. In this respect the Land Court decided two facts: first, that by "need" the testator meant actual financial or physical necessity, and second, that Harriet R. Ellms was not in need within the meaning or understanding of the testator, and that there is nothing in the will or in the attendant circumstances to indicate that to the testator his sister's need should include intellectual or cultural companionship. See *Stocker* v. *Foster,* 178 Mass. 591. The Land Court correctly ruled, as requested by the demandant, "That under the terms of Benjamin T. Ellms' will, Harriet R. Ellms took a life estate in 'the home place' on Gannett Street with a power to sell or dispose of it if she should need to during her lifetime and W. Irving Lincoln [the demandant] took a vested remainder in 'the home place' subject to being divested by a proper exercise of Harriet's power," and "That on the evidence in this case there was not a valid execution by Harriet R. Ellms of the power to sell or dispose of 'the home place.'"

*Exceptions overruled.*